557 A.2d 1141

Bishop Carroll High School, Petitioner *v.* Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

Argued February 8, 1989, before President Judge CRUMLISH, JR., and Judges CRAIG, DOYLE, BARRY, COLINS, MCGINLEY and SMITH.

*Maura K. Quinlan,* with her, *Philip J. Murren, Ball, Skelly, Murren & Connell,* for petitioner.

No appearance for respondent.

*Michael K. Parrish,* for John W. Kuskoski, intervenor.

OPINION BY JUDGE MCGINLEY, April 21, 1989:

Bishop Carroll High School (Bishop Carroll) appeals from a decision of the Unemployment Compensation Board of Review (Board) granting unemployment compensation benefits to John W. Kuskoski (Kuskoski). We reverse.

Kuskoski was a biology teacher at Bishop Carroll for 6 1/4 years prior to his discharge on November 10, 1987. The contract which he entered into on June 1, 1987, stated that "[t]he terms and conditions of employment are those stipulated in the agreement signed 10-27-86 between the Diocese of Altoona-Johnstown and the Altoona-Johnstown Catholic School Teachers' association."

The preamble of that agreement stated that "Subject to the laws of the Church, the Ordinary shall maintain the sole prerogative to dismiss a teacher for serious or public immorality, public scandal, or rejection of official teaching, doctrine, or laws of the Roman Catholic Church." Kuskoski had been given a copy of this preamble.

In late September of 1987, Kuskoski advised the principal of Bishop Carroll that he was cohabiting with a divorced woman to whom he was not married, and whose prior marriage had not been annulled. The principal advised Kuskoski that his behavior violated the terms of his employment contract. Kuskoski was advised that he would be discharged if he continued to cohabit outside of marriage. Kuskoski, in an attempt to avoid discharge, proposed to marry the woman in a civil ceremony, pursue an annulment of the woman's earlier marriage, and then be married in a Catholic Church. The principal advised Kuskoski that Church teachings require that the woman's prior marriage be annulled before she could be married again, and that Kuskoski's marriage to her without an annulment would also violate Church teachings and would constitute grounds for discharge. Kuskoski was given an opportunity to consider his options and he chose to continue to cohabit outside of marriage. He was discharged on November 10, 1987.[1]

Kuskoski applied for unemployment compensation benefits. The Office of Employment Security (OES) denied the application and Kuskoski filed an appeal for a hearing before the referee. The referee affirmed the denial of benefits pursuant to Section 402(e) of the Unemployment Compensation Law, 43 P.S. §802(e).[2] Kuskoski

---

[1] On Dec. 12, 1987, Claimant married the woman with whom he had been living. The marriage was performed by a Methodist minister.

[2] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*.

filed an appeal with the Board, which reversed the decision of the referee and granted benefits. The Board determined that Bishop Carroll failed to prove that Kuskoski's action constituted willful misconduct.[3] Bishop Carroll brought the within Petition for Review.

Bishop Carroll contends that the Board erred in concluding that Bishop Carroll failed to prove that Kuskoski's conduct constituted willful misconduct. Bishop Carroll further contends that Kuskoski did not have good cause for this conduct. Bishop Carroll also contends that the Board's decision violates Bishop Carroll's first amendment rights by imposing a burdensome tax on religion. In response, Kuskoski claims that his constitutional right to privacy would be violated by a denial of unemployment benefits.

Our scope of review is limited to a determination of whether necessary facts are supported by substantial evidence, whether an error of law was committed, or whether any constitutional rights have been violated. *Kirkwood v. Unemployment Compensation Board of Review*, 106 Pa. Commonwealth Ct. 92, 525 A.2d 841 (1987).

Bishop Carroll argues that Kuskoski's conduct constituted willful misconduct because he was specifically warned that if he continued to live outside of matrimony with a divorced woman he would be discharged, and because he knowingly continued his prohibited conduct. Bishop Carroll further contends that Kuskoski did not have good cause for his actions.

Willful misconduct has been defined as a disregard by an employee of the employer's interests, a deliberate disregard of the employer's rules, or a disregard of the standards of behavior that an employer has a right to expect of an employee. *Furmento v. Unemployment*

---

[3] (It was a 2-1 decision.)

*Compensation Board of Review,* 466 Pa. 81, 351 A.2d 631 (1976). In the case *sub judice,* Bishop Carroll charges Kuskoski with having violated a work rule. The burden of proof in violation of rule cases is well-established.

> The employer bears the burden of proving that an employee was discharged for willful misconduct so as to render the employee ineligible for benefits. . . . Where the willful misconduct is based upon a violation of an employer rule or policy, the employer must establish the existence of the rule or policy and that the employee was aware of it.

*Sauer v. Unemployment Compensation Board of Review,* 110 Pa. Commonwealth Ct. 107-08, 531 A.2d 1174, 1176 (1987). Willful misconduct may be established by showing a deliberate violation of a known and reasonable company rule. *Williams v. Unemployment Compensation Board of Review,* 109 Pa. Commonwealth Ct. 329, 531 A.2d 88 (1987).

The Board found that Bishop Carroll informed Kuskoski that his conduct constituted grounds for discharge under the terms of his employment contract, as a rejection of the official teaching, doctrine and laws of the Roman Catholic Church. Before we can decide whether Kuskoski's failure to effect changes in his lifestyle constituted willful misconduct, however,

> we must evaluate not only the reasonableness of the employer's request under the circumstances, but also the employee's reason for noncompliance. If the employee's behavior was justifiable or reasonable under the circumstances, it cannot be considered willful misconduct. In other words, if there was 'good cause' for the employee's action, he cannot be deemed guilty of willful misconduct.

> In an unemployment compensation case involving a charge of willful misconduct, the em-

ployer bears the burden of proving the charge.
But, if the claimant seeks to justify the behavior
in issue, or to show that it was reasonable, he
must bear the proof burden in that respect. (Cita-
tions omitted.)

*Simpson v. Unemployment Compensation Board of Re-
view,* 69 Pa. Commonwealth Ct. 120, 126, 450 A.2d 305,
308 (1982), *cert. denied,* 464 U.S. 822 (1983).

Kukoski concedes that he was aware of the existence
of the rule and the fact that his conduct violated the rule
and was grounds for discharge. He contends, however,
that his conduct did not constitute willful misconduct and
that he had good cause for his action because Bishop
Carroll's rule was unreasonable. Kuskoski claims that the
rule was unreasonable because it forced him to choose
between employment and family.[4] He further contends
that a denial of compensation benefits would constitute
an unconstitutional burden on his right to privacy. As
support for this position, Kuskoski relies on the U.S.
Supreme Court opinions in *Thomas v. Review Board of
Indiana Employment Security Division,* 450 U.S. 707,
101 S.Ct. 1425, 67 L.Ed. 2d 624 (1981); and *Sherbert v.
Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed. 2d 965
(1963).

In both *Thomas* and *Sherbert,* the unemployment
compensation claimant's conditions of employment had
been changed by the employer after the claimant already
had commenced working. Each claimant believed that
the practice of his or her religion did not permit him or

---

[4] Kuskoski asks this Court to view him as having been forced to
choose between employment and marriage, instead of between em-
ployment and cohabitation, because Bishop Carroll rejected his
proposal to marry the woman with whom he was cohabiting. We
decline to do so. If any rights were violated, it was not his right to
marry whomever he chose, but rather his alleged right of privacy to
live with someone outside of matrimony.

her to perform the new duties,[5] and each claimant was either discharged from, or voluntarily terminated, his or her employment based on an unwillingness to perform the new job duties. The U.S. Supreme Court held in both cases that although the state was not the employer, state action was involved, and the Court went on to state that the denial of benefits violated each claimant's constitutionally guaranteed freedom of religion, reasoning that each claimant was being forced to choose between his religion and his job, with the "price of choosing the former being the loss of state benefits." *Simpson*. The U.S. Supreme Court held that such coercion by the state constituted an infringement, albeit indirect, upon the free exercise of religion. *Thomas*.

Kuskoski maintains that he had a right of privacy with respect to his relationship outside of marriage and that although Bishop Carroll, as a private employer, could discharge him without violating this constitutional right, the Commonwealth of Pennsylvania violated it when it denied him unemployment compensation benefits.

Kuskoski contends that his situation is factually similar to that of the claimants in *Sherbert* and *Thomas*, except that his right of privacy was violated as opposed his right to free exercise of religion. We disagree. Whereas the claimants in those cases were faced with changed employment conditions which compelled them to choose between employment and their religion, Kuskoski knew when he signed his employment contract that he would be required to follow the teachings of the Catholic Church as a condition of employment. Consequently, without deciding whether or not Kuskoski has a constitutionally-protected right to cohabit outside of mar-

---

[5] In *Sherbert*, the claimant, a Seventh Day Adventist, was required to work on her Sabbath. In *Thomas*, the claimant, a Jehovah's Witness, was required to participate in the production of arms.

riage,[6] we find that he waived any such right when he signed his contract of employment.

This Court and our sister Court have found that constitutional rights may be waived by the execution of contracts. In *Pennsylvania Social Services Union v. Pennsylvania Board of Probation and Parole,* 96 Pa. Commonwealth Ct. 461, 508 A.2d 360 (1986), we held that arbitration procedures which the union negotiated in collective bargaining did not violate federal due process requirements for terminating public employees. We also noted, however, that even assuming arguendo that the procedures did violate due process, the employee who was terminated pursuant to those procedures "waived his right to independently raise due process objections in exchange for his greater protections under the collective bargaining scheme." *Id.* at 471, 508 A.2d at 365. Similarly, in *Federman v. Pozsonyi,* 365 Pa. Superior Ct. 324, 529 A.2d 530 (1987), we upheld the constitutionality of a confession of judgment provision in a lease, finding that the lessee voluntarily and intelligently waived his due process rights where he "negotiated the drafting of the lease through his attorney, and the lease itself reflect[ed] the various deletions and additions made pursuant to such negotiations." *Id.* at 329-30, 529 A.2d at 533.

The only question which remains is whether or not the sincerity of Kuskoski's belief that his conduct was constitutionally protected establishes "a state of mind that negates willful misconduct." We resolved this same issue in *Simpson,* holding that:

---

[6] Kukoski cites *Fabio v. Civil Service Commission,* 489 Pa. 309, 414 A.2d 82 (1980), as support for the claim that the right to privacy includes the right to cohabit outside of marriage. Therein the controversy concerned a police officer's vagueness challenge to the Philadelphia Police Duty Manual's definition of "conduct unbecoming an officer."

However sincere the claimant may have been in his perception of his legal rights, we must conclude that his mistake in that respect was not the kind that can be allowed to exonerate him and preserve his eligibility for unemployment benefits. His conduct was purely volitional, and disregardful of his employer's interest. There is nothing in this case to indicate that the claimant's beliefs about his legal rights were other than self-induced. If he wished to gamble on the accuracy of his personal jurisprudence, the Unemployment Compensation Fund should not be required to subsidize his misconception.

*Simpson,* 69 Pa. Commonwealth Ct. at 133, 450 A.2d at 312.

Having determined that Kuskoski's actions amounted to willful misconduct and that he did not have good cause to take that course of action, and having determined that his constitutional rights will not be violated, we reverse the Board's decision and reinstate the referee's denial of benefits.

### ORDER

AND NOW, this 21st day of April, 1989, the decision of the Unemployment Compensation Board of Review in the above-captioned matter is reversed.

Judge SMITH dissents.

---

DISSENTING OPINION BY JUDGE COLINS:

I agree with Judge BARRY'S dissent which raises the issue, not addressed by the majority, of the Board's conclusion that Bishop Carroll failed to show that claimant's behavior amounted to willful misconduct connected with his employment.

However, I believe that the majority's decision reversing the Board and thereby denying unemployment

compensation benefits to claimant violates the Establishment Clause of the First and Fourteenth Amendments of the United States Constitution, as well as Article I, Section 3 of the Pennsylvania Constitution.

The Establishment Clause of the First Amendment of the United States Constitution provides that "Congress shall make no law *respecting* an establishment of religion ... ." U.S. Const. amend. I (emphasis added). The use of the word "respecting" indicates a broad intent. A law might not actually establish a religion, but nevertheless be one leading to that end and therefore offend the First Amendment.

In *Walz v. Tax Commission of the City of New York*, 397 U.S. 664 (1970), the Court articulated the foremost evils against which the Establishment Clause was intended to protect as "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Id.* at 668. In assessing whether a law violates the Establishment Clause, the Court must make a determination which turns on whether the action in question is intended to directly interfere with or in effect interferes with or establishes religious beliefs and practices. *Id.* at 699. However, the Court stated that "[n]o perfect or absolute separation is really possible; the very existence of the Religion Clauses is an involvement of sorts—one that seeks to mark boundaries to avoid excessive entanglement." *Id.* at 670. The question here is whether the denial of benefits to claimant is excessive entanglement. The test unfortunately is one of degree. Either course, granting benefits or denying them, necessarily involves some entanglement. It is just such entanglement that this Court anticipated in reaching its decision in *Christian School Ass'n of Greater Harrisburg v. Department of Labor and Industry*, 55 Pa. Commonwealth Ct. 555, 423 A.2d 1340 (1980) to exempt religious schools from the mandatory requirements of the Unemployment Com-

pensation Law (Act).[1] This Court recognized that the Act might inflict an indirect burden on religion and sought to avoid even the possibility of a conflict between church and state.

Article I, Section 3 of the Pennsylvania Constitution provides:

> All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience, and *no preference shall ever be given by law to any religious establishments or modes of worship*. (Emphasis added.)

A state system cannot effectuate religious doctrines. Bishop Carroll of its own volition participated in the unemployment compensation system. It was never required to participate and remains free to terminate its participation at any time. Once it chooses to voluntarily assume this relationship, it thereby places itself within the jurisdiction of the Act in the same manner as any other employer and religious holdings must give way to secular laws. Bishop Carroll must accept the fact that under the mandate of the First Amendment the state has an obligation to remain as neutral as possible in the face of religious differences. *School District of Abington v. Schempp,* 374 U.S. 203, 215.

The majority, in its opinion, has glossed over the fact that claimant agreed to get married in a civil ceremony prior to his discharge. However, this was not acceptable to the school administration, since only a marriage recog-

---

[1] Act of December 5, 1936, P.L. (1937) 2897, *as amended,* 43 P.S. §§751-914.

nized by the Church would suffice. At that time, claimant could not marry his future wife in a ceremony recognized by the Church, since she had been previously married and civilly divorced. Church doctrine bars marriage by a priest unless a religious annulment is first obtained. Hence, the non-disputed facts are that claimant agreed to marry according to the laws of the Commonwealth and subsequently did marry in the Bakerton United Methodist Church, Elmora, Pennsylvania, on December 12, 1987. By denying unemployment compensation under these circumstances, we are making two religious declarations: (1) we will be allowing a religion to use the Act to further its tenets on a *de facto* basis; and (2) we will be using the Act to recognize a hierarchical system of marriage within the Commonwealth.

When Bishop Carroll told claimant that a civil marriage was not acceptable, it was imposing religious tenets upon claimant as a condition of continued employment. *Clearly, Bishop Carroll may require this of its employees and may fire its employees for failure to abide by the rules and teachings of the Church.* What Bishop Carroll may not do is require the state unemployment compensation system to define such actions as work-related willful misconduct. Claimant's refusal and inability to comply with a directive, essentially religious in nature, cannot be used to deny him unemployment compensation. The denial of benefits on that basis is certainly an excessive entanglement of religion and state.

In *Lemon v. Kurtzman*, 403 U.S. 602 (1971), the Court considered criteria gleaned from many years of case law and articulated a three-pronged test for whether state action is compatible with the Establishment Clause: (1) does the state action have a secular purpose; (2) would its effect neither advance nor inhibit religion; and (3) would such action avoid excessive entanglement of gov-

ernment and religion? *Id.* at 612-13.[2] If all three inquiries can be answered affirmatively, then the state action does not violate the Establishment Clause. *Bender,* 741 F.2d at 550.

Applying the criteria to the case *sub judice,* the questions to be answered are as follows: (1) does the Act, as it was applied to the facts in the case *sub judice,* have a secular purpose; (2) does the Act, as applied, neither advance nor inhibit religion; and (3) does the Act, as applied, avoid excessive government entanglement with religion? If we can answer yes to all three questions, then no Establishment Clause violation has occurred.

While the purpose of the Act itself is purely secular, the manner in which it was applied to the facts of this case has destroyed that secular purpose. The majority chooses to ignore that the "willful misconduct" of claimant complained of here is purely and simply a violation of the religious doctrines of the Church. This is particularly so in light of the fact that Bishop Carroll made no showing that the claimant's "willful misconduct" was job-related, as concluded by the Board. The Act, as applied here, effectively denying benefits to claimant because he chose to marry by a method unacceptable to the Catholic religion, serves to advance that religion. Additionally, the action taken here certainly does not avoid excessive government entanglement with religion. For all of the foregoing reasons, I would uphold the award of benefits.

Judge SMITH joins in this Dissenting Opinion.

---

[2] It should be noted that the Court has held in later cases that the *Lemon* test does not embody the *exclusive* criteria for determining whether state action violates the Establishment Clause. However, as noted in *Bender v. Williamsport Area School District,* 741 F.2d 538, 551, n.20 (1984), the Court continues to utilize the *Lemon* test.

DISSENTING OPINION BY JUDGE BARRY:

I respectfully dissent and would affirm the Board which reversed the decision of the referee and granted benefits to claimant.

The Board concluded that the employer had made no showing that the claimant's admitted cohabitation with a divorced woman was willful misconduct *connected with the claimant's employment*. The majority opinion does not address this issue but the record amply supports this conclusion of the Board. The petitioner was perfectly justified in discharging the claimant as the Board found, but I do not believe that benefits should have been denied.

Judge SMITH joins in this dissent.